Rebecca A. Patterson
Rebecca@sonosky.net
Lloyd B. Miller
Lloyd@sonosky.net
Sonosky, Chambers, Sachse,
  Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, AK  99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332

*Counsel for Plaintiff Yukon-Kuskokwim
      Health Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| YUKON-KUSKOKWIM<br>HEALTH CORPORATION,<br>P.O. Box 528<br>Bethel, AK 99559,<br><br>                    Plaintiff,<br><br>         v.<br><br>XAVIER BECERRA,<br>Secretary, U.S. Department of Health<br>  and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>         and<br><br>UNITED STATES OF AMERICA,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No._____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT

Plaintiff Yukon-Kuskokwim Health Corporation ("YKHC"), by and through its attorneys Sonosky, Chambers, Sachse, Miller & Monkman, LLP, complains and alleges as follows:

## INTRODUCTION

1.      This action seeks damages for the failure of the Secretary of Health and Human Services ("Secretary"), through the Indian Health Service ("IHS"), to pay YKHC certain "contract support costs" due under the Alaska Tribal Health Compact and YKHC's associated funding agreement (collectively, the "contract") with IHS in Fiscal Year ("FY") 2016. YKHC's rights arise under its contract and the statute under which the contract was awarded, the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 5301–5423.

2.      This action follows several Supreme Court decisions finding the federal government's failure to pay full contract support costs to tribal contractors like YKHC to be contrary to law and a breach of contract. *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 192–94 (2012) (Bureau of Indian Affairs contracts); *Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 567 U.S. 930 (2012), *on remand* 501 Fed. App'x 957, 959 (Fed. Cir. 2012) (*Arctic Slope II*) (IHS contracts); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 636–38 (2005) (consolidated cases) (IHS contracts).

3.      The claims covered by this Complaint assert that by failing to pay YKHC's full contract support cost requirement, the Secretary breached his legal obligations to YKHC. YKHC seeks as damages the unpaid contract support cost funds that the Secretary should have paid in FY 2016.

## JURISDICTION

4.     This Court has jurisdiction over this action pursuant to 25 U.S.C. § 5331(a) of the ISDA; 28 U.S.C. §§ 1331, 1362; and 41 U.S.C. §§ 7103–7107 of the Contract Disputes Act ("CDA").

## PARTIES

5.     YKHC is a tribal health organization that serves 58 federally recognized Tribes and their citizens in Southwest Alaska.  YKHC operates village clinics in 41 communities and sub-regional clinics in five larger communities.  At all relevant times, YKHC carried out the Alaska Tribal Health Compact and associated funding agreement with the Secretary pursuant to Title V of the ISDA, 25 U.S.C. §§ 5381–5399.

6.     Xavier Becerra is the Secretary of the U.S. Department of Health and Human Services ("DHHS").  Secretary Becerra exercises limited responsibilities delegated to him by Congress pursuant to the ISDA and other applicable law, including the authority to enter into contracts on behalf of the United States with Indian tribes and tribal organizations. Secretary Beccera has further delegated some of these responsibilities to officials of IHS, a constituent agency of DHHS.  Throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "DHHS," and "IHS" are used interchangeably.

# FACTS AND GENERAL ALLEGATIONS

## A.    The Indian Self-Determination Act

7.    The purpose of the ISDA is to ensure "maximum Indian participation" in the provision of services to Indian communities.  § 5302(a).[1]  The Act seeks to achieve this purpose through the "establishment of a meaningful Indian self-determination policy" that provides for the transition of federal programs serving Indian Tribes and Indian people from IHS operation to tribal operation.  § 5302(b).

8.    Under Title V of the ISDA, tribes and tribal organizations may enter into compacts with IHS to plan, conduct, and administer the healthcare programs that otherwise would be administered by the Secretary.  §§ 5382, 5384.  IHS must also negotiate and enter into funding agreements with compacting tribes and tribal organizations.  § 5385(a).

9.    Title V of the ISDA, § 5388(c), requires that "[t]he Secretary shall provide funds under a funding agreement under this subchapter in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this chapter, including amounts for direct program costs specified under section 5325(a)(1) of this title and amounts for contract support costs specified under section 5325(a)(2), (3), (5), and (6)[.]" Thus, the ISDA provides that tribes and tribal organizations that choose to contract for the operation of federal programs shall be paid two types of funding.  § 5388(c).  First, tribal contractors are entitled to be paid the Secretary's program funds.  § 5325(a)(1).  Second, tribal contractors are entitled to be paid contract support

---

[1] All citations to the U.S. Code are to Title 25 unless otherwise noted.

Case 3:24-cv-00073-HRH   Document 1   Filed 03/29/24   Page 4 of 21

costs. § 5325(a)(2), (3), (5), and (6). Both of these sums are required to be added in "full" to the contract award. § 5325(g).

10.     The first referenced subsection, § 5325(a)(1), provides for payment to the tribal contractor of the direct program funding, also called the "Secretarial amount," representing "the amount the Secretary would have expended had the government itself [continued to] run the program." *Arctic Slope Native Ass'n, v. Sebelius*, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), *vacated on other grounds*, 567 U.S. 930 (2012).

11.     The other referenced subsections, §§ 5325(a)(2), (3), (5), and (6), require IHS to pay contract support costs in addition to the "Secretarial amount." Contract support costs are mostly "administrative expenses," *Cherokee Nation*, 543 U.S. at 634, although they more precisely fall into one of two subcategories: (1) indirect administrative (or overhead) contract support costs "such as special auditing or other financial management costs," *id.* at 635 (citing § 5325(a)(3)(A)(ii)), and (2) direct contract support costs for certain annually recurring costs attributable directly to the personnel and facilities employed to carry out the contracted IHS programs, "such as workers' compensation insurance," *id.* (citing § 5325(a)(3)(A)(i)).

12.     The ISDA defines contract support costs with particularity:

The contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—

(i) direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii) any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any

> overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,

except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

§ 5325(a)(3)(A).[2]

13.     Generally, indirect contract support costs are determined by a reference to a tribal contractor's "indirect cost rate."  § 5304(g).  As the Secretary correctly explained in *Cherokee Nation*,

> Most contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe."  Brief for Federal Parties 7; *see* 25 U.S.C. §§ [5325](f)–(g).

543 U.S. at 635.

14.     Direct contract support costs are for costs attributable directly to the personnel and facilities covered by the program funds that are not otherwise incorporated into a tribal contractor's indirect cost pool.  *Id.* (citing § 5325(a)(3)(A)(i)).  These costs include, but are not limited to, the amounts actually incurred by a contractor in carrying out a contract.  According to IHS, these direct program expenses include insurance, training required to maintain certification of direct program personnel, other personnel costs such as workers compensation insurance, and "facility support costs to the extent not already made available."  Indian Health Serv., U.S. Dep't of Health and Hum. Servs., Indian Health Manual § 6-3.2D(1) (2019).

---

[2] As amended by the 2020 PROGRESS for Indian Tribes Act, Pub. L. No. 116-180, § 204(1)(B) (2020).

15.     The ISDA specifies that a tribe's contract support cost requirement may not duplicate costs already paid to a tribe as part of the Secretarial amount. § 5325(a)(3)(A). In adding this provision, Congress specified that "[i]n the event the Secretarial amount . . . for a particular function proves to be insufficient in light of a contractor's needs for prudent management of the contract, contract support costs are to be available to supplement such sums."  S. Rep. No. 103-374, at 9 (1994).

16.     Section 5321(g) of the ISDA mandates that § 5325 (along with every other provision of the Act and every provision of YKHC's contract with IHS) "be liberally construed for the benefit of the Indian Tribe participating in self-determination, and any ambiguity shall be resolved in favor of the Indian Tribe."

17.     The ISDA directs that "[u]pon the approval of a . . . contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)], subject to adjustments for each subsequent year that such tribe . . . administers a Federal program, function, service, or activity under such contract."  § 5325(g); *see also* § 5396(a) (providing that § 5325(a)–(k) "shall apply to compacts and funding agreements authorized by [Title V]").

18.     The ISDA permits, but does not require, that contract support costs be determined in a negotiation between the parties.  § 5325(a)(3)(C) (Tribes "shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.").  The Secretary's duty to add full contract support costs to a contract is not contingent upon such a negotiation.

19.     The ISDA delegates to the Secretary limited regulatory and discretionary authority, but this delegated rulemaking authority does not include authority to issue regulations concerning contract support costs. *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) ("Congress has clearly expressed in the [ISDA] . . . its intent to circumscribe as tightly as possible the discretion of the Secretary," and "[t]he statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; Congress left the Secretary with as little discretion as feasible in the allocation of [contract support costs]." (citation omitted)).

20.     Title V provides, "[u]nless expressly agreed to by the participating Indian tribe in the compact or funding agreement, the participating Indian tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the Indian Health Service, except for the eligibility provisions of section 5324(g) of this title and regulations promulgated under this section." § 5397(e). This provision was expressly incorporated into YKHC's contract. *See* Alaska Tribal Health Compact, art. II, § 9(a)–(b) ("Compact"); FY 2015–2017 Funding Agreement ("FA") § 8. The Secretary's Title V regulations do not address contract support cost issues, other than to note that the Secretary must provide contract support costs as specified in the ISDA. 42 C.F.R. §§ 137.79, 137.143. In sum, the ISDA provides for full recovery of all contract support costs incurred in carrying out the federal program that is the subject of a contract.

21.     When IHS runs federal programs providing health care to Indian people, it uses both appropriated funds from Congress and funds collected from Medicare, Medicaid, and private insurers. *See* Dep't of Health & Hum. Servs., FY 2016, IHS Justification of

Estimates for Appropriations Committees, at CJ-6, CJ-149 (available at https://www.ihs.gov/sites/budgetformulation/themes/responsive2017/documents/FY2016 CongressionalJustification.pdf). That is, IHS bills Medicare, Medicaid, and private insurers, it collects revenues from those sources, and it then uses those revenues to operate larger federal programs serving Indian people. *See* § 1621e(a); 42 U.S.C. §§ 1395qq, 1396j, 1397ee(c)(6)(B); *see also* H.R. Rep. No. 94-1026(I), at 108 (1976) ("[T]he Committee firmly expects that funds from Medicare and Medicaid will be used to expand and improve current IHS health care services and not to substitute for present expenditures."). This revenue is generally called "third-party revenues," and the generation and expenditure of third-party revenues is an integral part of IHS operations.

22. Similarly, when tribal contractors assume operation of federal programs pursuant to the ISDA, they also use both appropriated funds and third-party revenues to fund the program. Tribal contractors are required by the terms of their contracts and applicable federal law to bill and collect revenues from third-party payers such as Medicare, Medicaid, and private insurers, *see e.g.*, § 1623(b), and to spend such third-party revenues "to further the general purposes of the contract," § 5325(m)(1). Just as in an IHS-operated program, these third-party revenues are a crucial part of a tribal contractor's ability to provide health care.

23. Multiple federal circuit courts have held that tribal contractors are entitled to receive contract support costs associated with the expenditure of third-party revenues. *See San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236 (9th Cir. 2022), *petition for cert. granted*, 144 S. Ct. 418 (2023) (upholding materially identical claims); *N. Arapaho Tribe*

*v. Becerra*, 61 F.4th 810 (10th Cir. 2023), *petition for cert. granted*, 144 S. Ct. 419 (2023) (same); *but see Swinomish Indian Tribal Cmty. v. Becerra*, 993 F.3d 917 (D.C. Cir. 2021) (rejecting such claims).

### B.     The Contract Documents

24.     During FY 2016, YKHC operated various federal health care programs, functions, services, and activities pursuant to the contract.  YKHC provides crucial health care services to Alaska Native, American Indians, and other eligible individuals, living in 58 rural communities in the Yukon-Kuskokwim Delta.  These services include primary and emergency medical care, preventative care, pharmacy services, dental services, pediatric care, obstetrics, laboratory services, optometry services, behavioral health services, and other specialty services.  YKHC operates a hospital in Bethel, five sub-regional clinics in larger villages, and 41 village clinics in many smaller communities.[3]

25.     The programs described in paragraph 24 of this Complaint were operated pursuant to the Alaska Tribal Health Compact (the "Compact") with IHS.[4]  The Compact is the basic contract document at issue in this case. The terms of the Compact are required by and inextricably intertwined with the ISDA.  The Compact states that it "shall be liberally construed to achieve its purposes."  Compact, art. I, § 2.  Similarly, Title V of the ISDA, which governs the Compact, provides that "[e]ach provision of [Title V] and each

---

[3] Our Services, YKHC, https://www.ykhc.org/services/ (last visited Mar. 26, 2024).

[4] The Alaska Tribal Health Compact has been frequently amended and restated since the first version went into effect on October 1, 1994.  Relevant to the claims presented here is the FY 2011 version that went into effect on October 1, 2010, and all citations in this Complaint are to that version.

provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." § 5392(f).

26.     The Compact was written "to carry out a Self-Governance Program authorized by Title V, and is intended to transfer to tribal governments, at a tribe's request, the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out." Compact, art. I, § 2(a). It was also meant to "promote[] the autonomy of the Tribes in Alaska in the realm of health care." *Id.* Consistent with this purpose, the Compact relies heavily on the provisions of the ISDA.

27.     The core purpose of the Compact between IHS and YKHC is:

> to enable [YKHC] to re-design health programs, activities, functions, and services of the Indian Health Service; to reallocate funds for programs, activities, functions, or services according to the priorities of [YKHC]; to enhance the effectiveness and long-term financial stability of [YKHC]; and to streamline the federal Indian Health Service bureaucracy.

*Id.* art. I, § 2(b).

28.     The contract documents also include YKHC's annual funding agreements, which describe, among other things, the program YKHC will operate. The funding agreements are often amended throughout the year to take account of new funds available to YKHC. YKHC's funding agreements were incorporated in their entirety into the Compact. *See id.* art. II, § 2(c). In FY 2016, YKHC operated pursuant to the FY 2015–2017 funding agreement for its Title V funds.

29.     The contract documents that are controlling for the FY 2016 claim asserted here are the Alaska Tribal Health Compact, the funding agreement in effect for that year,

Case 3:24-cv-00073-HRH   Document 1   Filed 03/29/24   Page 11 of 21

modifications to those documents, and other statutory and administrative provisions incorporated by law into such contract documents, including the ISDA.

## C.     Claim History

30.     In FY 2016, the Secretary failed to pay the full amount of YKHC's contract support cost requirement.  IHS applied YKHC's indirect cost rate of 39.66% to determine the amount of indirect contract support costs due to YKHC.  But IHS failed to apply the rate to the *entire* direct cost base associated with the full federal program carried out by YKHC under YKHC's Compact with IHS.  Instead, IHS applied the indirect cost rate only to the portion of YKHC's funding that was funded with IHS-appropriated dollars.  IHS excluded from this amount the portion of YKHC's program spending that was funded with third-party revenues that YKHC collected and spent pursuant to its contract with IHS.

31.     The failure to pay contract support costs on the full federal program, including that portion funded by third-party revenues, led to an underpayment of $26,052,735.

32.     Those third-party revenues were earned by YKHC through its billing and collecting from third-party payers, such as Medicare, Medicaid, and private insurance, when it provided health care under the federal program.  Medicaid revenue made up about seventy percent of YKHC's third-party revenues in FY 2016.  Collections from private insurance and Medicare made up the vast majority of the remaining thirty percent.

33.     YKHC is required by law to seek outside payment for services where available, as (just like IHS) tribal contractors are the "payer of last resort" and may only use appropriated funds once all applicable third-party payers have been billed.  § 1623(b).

Case 3:24-cv-00073-HRH   Document 1   Filed 03/29/24   Page 12 of 21

34.     The third-party revenues collected by YKHC were then spent by YKHC on the contracted federal program, as required by law, including by providing additional health care services to beneficiaries.  § 5325(m)(1).  YKHC's annual costs to operate the federal program exceed the amount it receives from IHS, and so it is necessary for YKHC to use its third-party revenues to maintain the same level of services that would otherwise be provided by the Secretary.

35.     On September 29, 2022, YKHC filed a timely claim for reimbursement of its unpaid contract support costs incurred in FY 2016.  Ex. A.

36.     YKHC's claim letter asserted a sum certain of "$26,052,735 plus interest." The claim letter asserted that the Secretary's duty to pay contract support costs includes costs to support the portions of a tribal organization's contracted programs funded with third-party revenues received from Medicare, Medicaid, and private insurers and spent to carry out an ISDA contract "consistent with the decision issued in *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, Case No. 1:14-cv-00958 (D.N.M. Nov. 3, 2016)."  Ex. A at 2; *see also Navajo Health Found.—Sage Mem'l Hosp., Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), *appeal dismissed*, No. 18-2043, 2018 WL 4520349 (10th Cir. July 11, 2018); *San Carlos Apache Tribe*, 53 F.4th 1236; *N. Arapaho Tribe*, 61 F.4th 810; *but see Swinomish*, 993 F.3d 917.

37.     YKHC properly accounted for other sources of funding and other programs in calculating the direct cost base, properly allocated its indirect costs across all awards, and properly calculated the total indirect contract support costs due.

38. On March 29, 2023, the Secretary, acting through the IHS Deputy Director, denied YKHC's FY 2016 claim. Ex. B.

39. IHS denied that the Secretary was required by contract and by law to reimburse YKHC's indirect costs associated with the expenditure of third-party revenues spent to carry out the federal program under contract.

40. IHS also provided two other reasons for rejecting YKHC's claim: (1) according to IHS, YKHC should have but failed to provide documentation of the specific sources of the third-party revenue used for the additional expenditures being claimed and failed to show that this revenue was collected in connection with the contract, and (2) IHS's appropriation for FY 2016 had been cancelled and therefore IHS no longer had any funds available to pay the claim.

## COUNT I

### (BREACH OF CONTRACT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS IN FY 2016 ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES)

41. YKHC incorporates all previous allegations of fact and law into this Count I.

42. When YKHC took over operation of IHS's federal program, controlling law required YKHC to continue to bill, collect, and spend third-party revenues, just as IHS had done prior to YKHC's assumption of the federal program. §§ 1621e(a), 1621f(a)(1), 1641(c)(1)(B), 1641(d), 5325(m); 42 U.S.C. §§ 1395qq, 1396j, 1397ee(c)(6)(B). The billing, collection, and expenditure of third-party revenues to carry out the contract was expressly contemplated by the parties' contract.

43.     YKHC was entitled to have contract support costs added to support the IHS federal program YKHC operated in FY 2016, regardless of the extent to which that federal program was funded by appropriated dollars or third-party revenue dollars.

44.     IHS failed to calculate and pay the administrative costs of operating the third-party revenue-funded portion of the program, even though generating those revenues and spending them on health care was expressly contemplated by the Compact and was an integral and essential part of the federal program described in the Compact, *see* Compact, art. III, § 7, and even though the expenditure of those revenues pursuant to the contract caused YKHC to incur substantial administrative costs.  IHS's failure to pay YKHC the indirect contract support costs associated with YKHC's third-party revenue-supported health care operations—that is, the failure to include these third-party revenues in the IHS direct program base against which YKHC's indirect cost rate were applied—resulted in significant under-reimbursements to YKHC of indirect contract support costs.  It was also contrary to law.

45.     As a result of IHS's breach of contract, YKHC was required to divert resources to cover the indirect costs associated with the expenditure of the third-party revenues.  The diverted funds were thus no longer available for other crucial health care purposes under the contract, such as hiring providers to serve village clinics, building patient and employee housing, replace clinics that have not yet been updated, and increasing provider salaries to improve retention.

46.     Neither of IHS's other arguments provides a lawful basis to deny YKHC's claim.

47.     YKHC properly presented its claim to IHS, including providing IHS with adequate information to understand the basis for YKHC's entitlement to the relief requested.  *See Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) ("We know of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording.  All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.").  YKHC's claim included both a sum certain and an explanation of how that sum was calculated.  This was sufficient to state a claim under the CDA.

48.     YKHC properly accounted for other sources of funding and other programs in calculating the direct cost base, properly allocated its indirect costs across all awards, and properly calculated the total indirect contract support costs due.

49.     The fact that IHS's FY 2016 appropriation may have been cancelled and is therefore unavailable to use to pay YKHC's claim at this time does not mean that YKHC's claim was lawfully denied.  In the event of a judicial decision sustaining YKHC's breach of contract claims in this matter, the federal Judgment Fund must be used to pay YKHC the resulting judgment.  31 U.S.C. § 1304; *see also* U.S. General Accounting Office, Principles of Federal Appropriations Law, GAO-08-978SP at 14-31, 45 (3d ed. 2008), https://www.gao.gov/assets/2019-11/203470.pdf; *Salazar*, 567 U.S. at 198 ("Congress expressly provided in ISDA that tribal contractors were entitled to sue for 'money damages' under the Contract Disputes Act upon the Government's failure to pay, 25 U.S.C. §§ [5331](a), (d), and judgments against the Government under that Act are payable from

the Judgment Fund, 41 U.S.C. § 7108(a).”); *cf. Cherokee Nation*, 543 U.S. at 642 (explaining that a contractor is “free to pursue appropriate legal remedies arising because the Government broke its contractual promise” when an agency’s appropriated funds are otherwise committed).

50.     General contract principles control the calculation of damages in government contract litigation.   This is so because “[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.”  *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *see also Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000) (quoting *Winstar* and relying on the RESTATEMENT (SECOND) OF CONTRACTS (1981) (“RESTATEMENT”)); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil*, 530 U.S. at 607, and applying principles of general contract law).

51.     General contract law on the issue of damages is clear that a contractor is entitled to damages which will protect “his ‘expectation interest,’ which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed*.”  RESTATEMENT § 344(a) (emphasis added).

52.     YKHC incurred no less than $26,052,735 in indirect costs associated with the expenditure of third-party revenue that was generated and spent pursuant to the IHS contract.   The Secretary admits that IHS did not pay any indirect contract support costs associated with these expenditures.   In failing to pay YKHC this amount, the Secretary breached his contract with YKHC.

## COUNT II

## (BREACH OF STATUTORY RIGHT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS IN FY 2016 ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES)

53.     YKHC incorporates all previous allegations of fact and law into this Count II.

54.     The ISDA creates a right of action for money damages to remedy the Secretary's breach of his obligations under the ISDA. § 5331.

55.     Under § 5325(a)(2)–(3), the Secretary in FY 2016 had a statutory duty to reimburse YKHC's full indirect contract support costs.

56.     The Secretary failed to pay YKHC $26,052,735 in indirect contract support costs due in FY 2016.

57.     Due to the Secretary's breach of his statutory obligations, YKHC was required to divert resources to cover the indirect costs associated with the expenditure of the third-party revenues. These funds were thus no longer available for other crucial health care purposes under the contract.

58.     In order to remedy the Secretary's breach of his statutory obligations, YKHC is entitled to damages of no less than $26,052,735, plus applicable interest and attorneys' fees and costs, all as specifically prayed below.

Case 3:24-cv-00073-HRH   Document 1   Filed 03/29/24   Page 18 of 21

## RELIEF REQUESTED

WHEREFORE, the Yukon-Kuskokwim Health Corporation prays that this Court grant the following relief:

A.      A declaratory judgment that the Secretary acted in violation of the ISDA and in breach of his contracts with YKHC by failing to pay YKHC the full amount of contract support costs that YKHC incurred under its contracts with the Secretary in FY 2016;

B.      A money judgment for $26,052,735, the amount due YKHC as a result of the Secretary's actions described in paragraph A, including consequential and other allowable damages for underpayment of contract support costs;

C.      Interest for one year from the payment due date for the payment the Secretary failed to make under the contract, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907;

D.      Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, from the date the claim was filed until the date of payment upon entry of final judgment;

E.      Costs and attorneys' fees incurred in pursuing this claim, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 5331(c) and other applicable law; and

F.      Such other monetary, declaratory, and equitable relief as this Court may find to be just.

Respectfully submitted this 29th day of March, 2024.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By: _s/ Rebecca A. Patterson_
Rebecca A. Patterson
AK Bar No. 1305028
Rebecca@sonosky.net
Lloyd B. Miller
AK Bar No. 7906040
Lloyd@sonosky.net

Attorneys for Plaintiff Yukon-
Kuskokwim Health Corporation

Case 3:24-cv-00073-HRH   Document 1   Filed 03/29/24   Page 20 of 21

## **VERIFICATION**

Dan Winkelman says:

I am the President and Chief Executive Officer of Plaintiff Yukon-Kuskokwim Health Corporation, and I make this verification by authority for and on its behalf. I have read the foregoing Complaint, know the contents thereof, and from information officially furnished to me believe the same to be true.

I verify under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: 3/29/2024

_____
Dan Winkelman
President & CEO, YKHC